## Daniel Wilson (a colored man) v. Edmund Melvin.

1. In a suit for freedom, under our statute, where the plaintiff claims on the ground that the master has violated the constitution of Illinois by introducing slavery within its limits, the test question to ascertain whether such violation has been committed, and a consequent forfeiture taken place, is whether the master *made any unnecessary delay in Illinois* with his slaves.
2. It is not whether the *slave* acquired a *residence:*
3. Nor is it, whether the *master* became a *domiciliated resident* of Illinois:
4. Nor is it of any consequence that the slave remains *voluntarily* in Illinois.
5. Where the testimony clearly proved that defendant left Tennessee with an intention of residing in Illinois, and that after a months stay in Illinois, he proceeded to St. Louis to hire out his negroes, and after doing so, returned to Illinois and spent the summer—raised a crop, &c. It is error for the court to give an instruction founded on the assumption that defendant was a mere transient sojourner in Illinois,—such instruction being well calculated to mislead the jury.

APPEAL from the circuit court of St. Louis county.

*Bird* and *Sproat,* attorneys for plaintiff in error:

1st. That Melvin, in the person of Daniel, introduced slavery into the State of Illinois.

2d. That Melvin, in the person of Daniel, introduced involuntary servitude into said State.

3d. That Melvin came into said State with Daniel with the intention of making it the place of residence of both self and Daniel.

Julia v. M'Kinney, 3 Mo. Rep. 270;-- Rachel v. Walker, late Mo. Rep. 1.

JUNE TERM
1837.

Wilson v. Melvin.

5 Ha. & 7, 190; 6
Ran. 652, Law of
Nise Prius, 303,
30, 4.

4th. That Daniel, under the control of Melvin, remain-ed in the State of Illinois as a slave at different times, and for different spaces of time.

5th. That Daniel was hired to service in the State of Illinois, being bound to service in another State.

6th. That the instructions in the court below were erroneous.

7th. That said instructions not only assumed facts within the province of the jury only, but were of a character to mislead the minds of the jury from the real circumstances in evidence.

8th. That if any doubts existed as to the bearing of the facts, the slave Daniel should have had the benefit of such doubts.

9. That the verdict was against evidence.

10th. That a new trial ought to have been granted.

*J. Spalding*, attorney for defendant.

1st. The verdict is not against evidence. The reason does not assert that it is against the weight of evidence. The verdict may well be against evidence, and yet may be sufficiently supported by other evidence, so that the question does not arise here whether on the whole testimony the verdict ought to stand, as being supported by such weight of testimony; that the court will not interfere, though there may be testimony against the verdict.

If, however, this reason for a new trial be considered as equivalent to the assertion, that verdict is against the weight of testimony. I refer to the bill of exceptions to show that there is a sufficient testimony to uphold the verdict.

2d. That the court did not misdirect the jury in any matter of which Daniel has a right to complain. If there be any misdirection, it is in favor of Daniel; 2 Miss. Rep; 20, Lagrange v. Chouteau; 3 Miss. Rep. 400, Nat v. Ruddle.

Statement of the case and opinion of the court, delivered by TOMPKINS, Judge.

Wilson brought his action for freedom, under the statute against Melvin, and judgment being given against him, he appealed to this court.

From the testimony saved in the bill of exceptions, it appears that, in the month of March, of the year 1834, Edmund Melvin, the defendant in this action, and appellee in this court, removed from the State of Tennessee to the State of Illinois, bringing with him two slaves, one of

which was Daniel Wilson, the plaintiff in the action, appellant here. He arrived in the county of St. Clair, in Illinois, between the tenth and fifteenth days of March, of the year 1834, as aforesaid, where he remained till the fall of that year, and made a crop of corn on rented ground. Within the space of a month, some say a less time, after his arrival in St. Clair county, the appellee, Melvin, went to St. Louis, in Missouri, where he located the slaves above mentioned. The appellee brought with him from Tennessee a wagon and team;—the wagon stood in the yard of the son of the appellee, with whom he passed the summer, unloaded, till the negroes were taken to St. Louis, because the appellee was told if "he did, and made any place their home," the slaves would obtain their freedom. He appears to have been impressed with the belief that unloading his wagon would have been evidence that he had fixed a place of residence.

One of the witnesses at whose house the appellee remained while he staid in Illinois, stated that his father, the appellee, was not employed about any thing particularly for about the three first weeks he spent in Illinois, before he took the slaves in question to St. Louis; that he spent his time in visiting his children, and that the slaves did little except to feed the horses; that the appellant did some work for one Ingle, and brought the money to witness, and said he had made something for the old man, and gave the witness the greater part of the money, and kept the rest himself. The witness passed the money to the appellee, but does not know that Ingle hired the appellant's services from the appellee.—The appellant assisted the witness to cut down some trees for rail timber, but had no orders to do so from the witness, or from any other person known to the witness. In the month of July, of that year, while the cholera prevailed in Saint Louis, the two slaves came over to Illinois, by permission, it was said, of the appellee, and were employed by the appellant, for one week, or perhaps more, in the harvest field, and the women in domestic business. Some other testimony, not material, was given, as to the occupation of these persons during the time they spent in Illinois after their return from St. Louis.

The court instructed the jury as follows:

1st. That if they believed the defendant hired out the plaintiff as his slave, residing in Illinois, that they shall find for the plaintiff.

2d. If they shall be of opinion that the defendant being a domiciliated resident of the State of Illinois, used the

JUNE TERM
1837.

Wilson v. Melvin.

plaintiff as his slave therein, they shall find for the plaintiff.

3d. If they shall find that the plaintiff voluntarily went to the State of Illinois, his habitual place of residence being in the State of Missouri, and did not, at any time, act as a slave in Illinois under the coercion of his master, with the exception of that time during which the plaintiff's master was merely a transient person in the State of Illinois, they shall find for the defendant.

4th. If they shall be of opinion that the defendant in his passage through Illinois to Missouri, sojourned only a reasonable time with his children in that State, and without any intention of domiciliating himself therein, they shall find for the defendant, though during such sojourn he used the plaintiff as his slave.

After verdict found for the defendant, the plaintiff moved for a new trial, because,

1st. The jury found their verdict against evidence.

2d. The circuit court misdirected the jury.—This motion was overruled, and it is assigned for error that the court erred in overruling the motion for a new trial, and that the court misdirected the jury. Many causes have been decided in this court of persons claiming freedom because they have been held in Illinois as slaves. The first found in our book is that of Winney v. Whitesides. In that case the court says that the person who takes his slave into said territory (the cause of action arose under the territorial government) and by the length of his residence there indicates an intention of making that place his residence, and that of his slave, and thereby induces a jury to believe that fact, does, by such residence, declare his slave to be a free person;—1st Mo. Decisions, 476. In the case of Vincent v. Duncan, it is said that if the owner stay in Kentucky, and send his slave to work in Illinois, he becomes free; see 2d vol. Mo. Decisions, 214. In the case of Ralph v. Duncan, it is said that the object of the ordinance of 1787, was to prohibit the introduction of slaves into the territory of Illinois, of which the State of Illinois now constitutes a part, and the master who permits his slave to go there to hire himself, offends against that law as much as one who takes his slave along with himself to reside there; and if we are to regard the moral effect of the act, it is much worse for the master to permit the slave to go there to hire himself to labor than to take him along to reside there under his own inspection, or to hire him out personally to some one who will be bound to pay the master the hire.—See 3d vol. Mo. Dec. 195. In the cases above cited, the plaintiffs claimed their

freedom because they were, as they alleged, held in slavery in violation of the act of Congress. The present plaintiff claims his freedom because he was, as is alleged, held in slavery in violation of the constitution of the State of Illinois. This constitution, like the ordinance of 1787, provides, that neither slavery, nor involuntary servitude, shall hereafter be introduced into the State, unless, &c. The case of Julia v. McKinney, see 3d vol. Mo. Decis. 270, was one in which the plaintiff claimed her freedom, because she was, as is alleged, held in slavery contrary to this provision in the constitution of that State. In this last cited case, the court say, the owner of the slave went into Illinois with an avowed view to make that State her home;—she took up her residence there with her slave in her possession, and kept the slave there for upwards of one month, and treated the slave in all respects as slaves are treated in States where slavery is allowed. These acts of the owner surely amounted to the introduction of slavery into Illinois. In this case, and in that of Nat vs. Ruddle, 3 Mo. Decisions, 400, this court has manifested its opinion that the construction of the act of Congress of 1787, and that of the constitution of the State of Illinois, ought to be the same. In the case now before us for adjudication, evidence was offered that the plaintiff in the action went about in Illinois for several weeks before he was hired out by his master in St. Louis at work for different persons, and it was also in evidence that money received by him came to the hand of the defendant his master. In July, when the plaintiff returned to Illinois, he was, with the knowledge of his owner, employed in the harvest field, and otherwise, for several persons, and his owner, the defendant in the action, endeavored to prove that the plaintiff came over to Illinois voluntarily, and that he was not ordered by him to work for any one. The evil which the State of Illinois seemed desirous to avoid, was the introduction of slavery, or involuntary servitude, and it does not appear that the person who brings slaves into the country and suffers them to go about making contracts for themselves, and laboring for strangers, would less offend against the constitution of that State, than he who would keep his slaves at work wherever he himself for the time sojourned, and subject them to strict discipline. Indeed in the case of Ralph v. Duncan, above cited, it is considered a much more evil practice to permit a slave to hire himself out to labor, than for the master to do it himself.

In the case of Julia v. McKinney, above cited, 3d vol.

JUNE TERM
1837.

Wilson v. Melvin.

p. 273, the court say, how long the character of emigrant or traveller through the State may last, cannot, by any general rule, be determined; but it seems that reason does require that it should last so long as might be necessary according to the common modes of travelling, to accomplish his journey through the State. If accident should happen to the emigrant, which, in ordinary cases, would make it reasonable and prudent to suspend his journey a short time, we think he might do so without incurring a forfeiture, if he resumes his journey as soon as he safely could. Something more than the mere convenience, or ease of the emigrant, ought to intervene to save him from a forfeiture. Something of the nature of necessity should exist before he would, or ought, to be exempted from the forfeiture. The preceding decisions being reviewed, the instructions given by the court will now be examined:

In a suit for freedom, under our statute, where the plaintiff claims on the ground that the master has violated the constitution of Illinois by introducing slavery within its limits, the test question to ascertain whether such violation has been committed, and a consequent forfeiture taken place, is whether the master *made any unnecessary delay in Illinois* with his slaves.

The first instruction is, that if the jury believed the defendant hired out the plaintiff as his slave, residing in Illinois, they shall find for the plaintiff. This instruction appears to be wrong, inasmuch as it seems to require the slave to be a resident, in order to make the hiring unlawful. The true test would be as declared by the court in the case of Julia vs. M'Kinney, whether Melvin, the appellee, made any unnecessary delay in Illinois, before he took his slaves to St. Louis to be hired out. To acquire a residence, one must have rights;—the plaintiff had none. The stay in Illinois was his master's act.

It is not, whether the *slave* acquired a *residence*.

The second instruction seems calculated to mislead a jury, and therefore wrong, because it assumes that the jury must find that this appellee was a domiciliated resident of the State of Illinois, and treated the plaintiff as his slave therein, before they can find for the plaintiff. The true rule being as before stated, that the jury should inquire whether the owner made any unnecessary delay in Illinois. If he made no unnecessary delay, it surely could not injure his cause, that he treated the plaintiff as a slave ought to be treated.

Nor is it, whether the *master* became a *domiciliated resident* of Illinois. Nor is it of any consequence that the slave remains *voluntarily* in Illinois.

The third instruction seems to be improperly given; because the jury are directed to find for the defendant, Melvin, appellee here, in case they believe the plaintiff went to Illinois *voluntarily*—and did not at any time, act under the *coercion* of his *master*, with the exception of that time, during which the plaintiff's master was merely a *transient person*, in the State of Illinois. It has before been shown, that the circumstance of the slave's stay in Illinois being voluntary, does not, in the opinion of this court, at all extenuate the offence against the constitu-

tion of Illinois. In Ralph vs. Duncan, p. 195, vol. 3rd, the court say, the master who permits his slave to go to Illinois to hire himself offends as much against the law, as one who takes his slave along with himself, to reside there; and still less will it avail him, that the slave is not under his *coercion* while staying in Illinois. Under his own inspection, his slave would probably conduct himself with propriety—suffered to ramble, and undertake work where he.pleased, his opportunities to do mischief would be much greater. But the most exceptionable part of this instruction appears to be that contained in the exception. It seems to be assumed here, that during the few weeks succeeding the 10th of March, 1834, that intervened betwixt the defendant Melvin's arrival in St. Clair county, Illinois, and the time at which he took-his slaves to St. Louis, to be hired out, he Melvin, was a mere transient sojourner;—whereas the evidence is, that he, after staying in St. Clair county three or four weeks, went to St. Louis—hired out his negroes, and then returned, and made and sold a crop, in Illinois, leaving that State only towards the close of the year. The only question to be submitted to the jury, as before observed, was, whether he had made any unnecessary delay? and the decision of this question seems to be taken from the jury, by the assumption, that Melvin, the defendant, was merely a transient person in the State of Illinois.

The fourth instruction appears to be founded on the idea, that the defendant, when he arrived in St. Clair county, was on a journey through Illinois to Missouri.

The evidence was, that he left home in Tennessee, with an intention of residing in Illinois. Andrew Melvin says, that when his father came to Illinois, he was told he could not keep his slaves in Illinois for twelve months, and he went to Belleville, and ascertained that he could not; and after he-found he could not keep them in Illinois, he took them to St. Louis. This evidence is corroborated by that of another son of the defendant; and it is certain, that the defendant's journey was ended in St. Clair county, of Illinois; and that he only extended it to St. Louis at his leisure, to hire out his negroes, when he found he could not keep them in Illinois, by moving them out once a year. It is by no means necessary for the jury to find how much time the defendant might, on this occasion, have reasonably spent in company with his children; but it being proved that he stayed there three or four weeks before he went to St. Louis, and that, in a very short time, he returned and made a crop of corn, and

JUNE TERM
1837.

Wilson v. Melvin.

Where the testimony clearly proved, that defendant left Tennessee with an intention of residing in Illinois, and that after a month's stay in Illinois, he proceeded to St.Louis to hire out his negroes, and after doing so, returned to Illinois, and spent the summer, raised a crop, &c. It is error for the court to give an instruction founded on the assumption that defendant was a mere transient sojourner in Illinois —such instruction being well calculated to mislead the jury

JUNE TERM
1837.

remained in the State to gather and sell it. If they believed that the defendant did all this, without any intention of *domiciliating himself therein,* they must have been very incredulous indeed. So that, even admitting that it was in evidence, that the defendant had, when he left home, meditated a journey through Illinois to Missouri, it appears that the jury ought, in conformity with this instruction, to have found for the plaintiff.

Because, then, all the instructions given by the court appear to me to be calculated to mislead a jury, I am of opinion, that its judgment ought to be reversed. The presiding Judge being also of opinion, that the judgment ought to be reversed—it is then reversed, and the cause will be remanded to the circuit court, to be proceeded in conformably to this opinion.

M'Girk, Judge. I concur in the foregoing opinion.